May it please the court. My name is Don Cherez from Las Vegas, Nevada. This is a case for organizational purposes. I've organized it into three basic ideas. The footnote, the fraud, and the Fajardo Fairness Standard. And this is a simple case that if you want to look at the technical form of the law, you have to agree with the government. The government sent a certified receipt to an address that had been provided to the government. But this is the classic case where form does not lead to justice. This is a classic case where substance really should take precedence over the form, even if you look at the whole issue about the footnote. And what I'm referring to is when the motion to reopen was made to set aside the in absentia deportation hearing, even Judge Simpson, the immigration judge here in San Francisco, looked and said, hey, something is wrong here. The signature on the certified receipt is not the same as the signature on the order to show cause document. And to be honest, Your Honor, I'm frankly confused about what he's referring to in terms of the order to show cause document, because as I've looked at both of those things from the record, I believe that neither of those signatures belong to my client. Now, the other problem we have with this particular case is we're talking about a deportation proceeding that began in 1995, actually in 1993 under the old law, and yet we're trying to provide or use equitable principles that have taken place since 1997 when these new technical requirements went into place after April the 1st, 1997, with the passage of the IRA-IRA or the Illegal Immigration Reform and Immigrant Responsibility Act. But despite all of that, the fact that the judge recognized something is wrong with these signatures and he noted that should have at least been enough to say maybe we need to have a factual hearing rather than just denying and saying this guy blew off this case. Now, why would a person like my client, who had everything to gain and nothing to lose by coming to an immigration deportation hearing, blow off a case? And it's very simple. Because he didn't hear parts of it. Sorry. Perhaps you could help me out. I'm a little confused about how we get to the issue of notice, really, and whether it was sufficient, because of a time limit on seeking to reopen. All right. And, you know, there was no request before the BIA for any kind of equitable tolling and nothing that sort of cries out for it. Well, actually, there was, Your Honor, but not very strong. I mean, the initial motion to reopen, because this was a situation where at least with the initial motion to reopen, they do the affidavit, and, of course, they're in such a hurry that they use the name Illuminato Vista, so they were using what I call boilerplate language from another case, and I was surprised. I didn't know about the hearing, and I never showed up. And then, of course, my client signs his signature, DPO Campo. Well, so that was done by a lawyer, I think it was the Abramowitz Law Firm in Los Angeles or Van Nuys. So in that sense, they were just in a hurry to get something, because this guy had been in custody at that particular point about 30 days. Now he's been in custody two and a half years. Another lawyer comes in to take over, and she tries to build up the case and does a little bit more. Now, of course, at this time, nobody has access to the administrative record, and if you actually look in the court file, you'll see that the administrative record was filed six months late. And to even be more honest with you, to me, the administrative record is woefully inadequate. It doesn't include the initial application for political asylum. There's a lot of stuff that's not in there, but at any rate, given the fact that we had the deadlines, we just went ahead and presented the argument based on the administrative record that we were able to gather at that particular time. Let me put my question maybe a little differently. Okay. What is it that you are actually asking us to do, and how can we do it? Okay. What I'm asking you to do is to say it was wrong for the immigration judge and wrong for the Board of Immigration Appeals to not grant the motion to reopen. Because? And at the very least, they should grant the motion to reopen so the BIA or the immigration judge can decide, did Daniel Ocampo receive notice of the immigration hearing? But it can't do that if the motion is out of time. Well? Unless there's something that gives it the right to do that. And there is, Your Honor. I mean, I'm looking at this booklet that I got called Immigration Law and the Ninth Circuit. We do refer to the cases in our brief. There are other cases that are referred to here that say that even if a motion is beyond the time limit, equitable tolling does apply. It does if there is fraud involved. No. If it's asked for or if at least looking at the papers, there's some hint that equitable tolling is being invoked. And my trouble is that I look at the papers before the BIA, and I don't see any hint. And that's why I'm asking you if I'm wrong. Well, I would say, yes, there is a hint, Your Honor. Okay. And I think that the attorney who represented Mr. Ocampo at the Board of Immigration Appeals was Joey Marshall. She's no longer practicing law in Las Vegas. And, again, you know, these are people that are what I basically are using boilerplate language. But they do allege, hey, there's the element of surprise here. He had gone to the original political asylum interview. He never knew about the hearing. So, you know, essentially this was a process of discovery in determining why was there no notice. I mean, was Daniel Ocampo lying to the immigration judge, or was Daniel Ocampo genuinely ambushed? And so if you look at some of the other documents that are in there, he's putting down I-589 pending. The political asylum application is pending. Now, he did that more than once. He did that on several immigration applications that he filed, saying, I'm still waiting for my hearing. And there was a time, let's say 10 years ago, when it would take years to go from the time that you filed an application to the time that you genuinely were able to get in front of an immigration judge. Now, what I don't understand is why did Daniel Ocampo, who was a Las Vegas resident, come to San Francisco? And frankly, I believe the only possible explanation is because it was convenient for the individual who prepared his political asylum application to get him in front of an immigration judge for him to go from Stockton to San Francisco. It wasn't in my client's best interest. I mean, why would my client, frankly, I don't understand why my client would allow himself to file for political asylum when he was a nurse. There's a shortage of nurses in the United States. By the year 2010, we'll have a one million nurse shortage in this country, and that was the easiest route to go. That was the most, I mean, it was a guarantee. As soon as you pass the test, as soon as you get a license, you can get a visa. But these individuals who file these political asylum applications genuinely don't have a, they don't know what they're doing. And that's what I believe happened in this particular case. And frankly, because of that, Daniel Ocampo had no clue that he was supposed to attend that hearing in April of 1995. So, and that's where the judge is looking, like saying, well, this signature is the same as the previous signature that was sent to the Stockton address. You know, he must have had notice. And so I believe that what I'm asking you to do is to say, the Board of Immigration Appeals, at the very least, should grant the motion to reopen so they can take additional evidence, and that's what I'm asking you to do. And so I believe that what I'm asking you to do is to say, the Board of Immigration Appeals, at the very least, should grant the motion to reopen so they can take additional evidence, and some of the documents that I have now been able to gather since the initial motion to reopen, that they could look at it and say, yes, there was fraud involved here. Yes, he did not have notice here. Yes, sure, it's being done five years later, six or seven years after the actual hearing, but he was ambushed. And that just doesn't comply with due process. So in that sense, I've seen these other cases from the Ninth Circuit where, yes, if we believe somebody has been the victim of ineffective assistance of counsel, if we believe that somebody has been the victim of fraud by an immigration assistant, you know, this court has stepped up to the plate to say, that's not due process, and we want to do something about it. And so, you know, I'm stuck with an incomplete record because of the previous lawyers that went before me, and even the previous non-lawyer that went before me. And so I've tried to build the strongest possible case to show that, yes, there was a hint, that we were surprised, yes, we weren't trying to hide anything, yes, we would have come to the hearing, and yes, we had everything to gain by appearing at a hearing, and everything to lose by not appearing. And so based on that, the logic would say, this is a case, a classic case of fraud, this is a classic case where form, that form should not come over substance, and in order to do the right thing, we should find a procedural mechanism to do the right thing. And so that's what we're trying to do. We're trying to find a procedural mechanism to ask the Board of Immigration Appeals to grant the motion to reopen or at least have another hearing so we could provide those documents. Thank you, Your Honor. All right. Thank you, Mr. Chavez. Mr. Bernstein. Thank you, Your Honor. May it please the Court. My name is Jeffrey Bernstein, and I represent the Attorney General of the United States. I guess I first want to address the brand-new arguments made in the brief, and the brand-new arguments made in the brief. And I guess I first want to address the brand-new arguments made in the brief, and the brand-new arguments made at the podium this morning. Obviously, as the brief points out, none of these arguments were made before the Board of Immigration Appeals or the immigration judge. He's failed to exhaust, and the Court can't consider them. But lest the Court — He did argue he didn't get any notice, didn't he? Your Honor — He did — I mean, he did say they didn't get any notice. I mean, he's been — Yes, but he's seeking to raise to this Court brand-new facts, which were not placed before the administrative adjudicators, and he simply can't do that. But I want to say that lest the Court believe that these new matters have any substance at all, they do not. And one only needs to look at the materials, which the Court has to exclude. But the Court has — if the Court wishes to solace itself with the fact that, really, there is nothing to the allegations, it can look only to the evidence. First, Mr. Ocampo alleges that he wanted this individual named Jerry to assist him with an employment visa, not an asylum application. But an examination of Jerry's letter reveals that Jerry wanted only Mr. Ocampo's help in bringing registered nurses from the Philippines to the United States. He certainly was not — the letter doesn't indicate that Mr. Ocampo was enlisting Jerry's help in filing anything. And, of course, he alleges that Jerry filed an asylum application instead of an employment visa application. And, again, nothing in this letter indicates that Mr. — that Jerry was a notario who was going to assist Mr. Ocampo in anything. Again, there's no evidence here that he was a notario, and the allegation that Jerry filed an asylum application does — simply doesn't hold up. Second, the assertion that Jerry used a business — his business address as Mr. Ocampo's address is belied by the address in the letter to Mr. Ocampo from Jerry. The letter — the addresses are completely different. Third, Mr. Ocampo signed the asylum application. He signed it. And a comparison of his signature on that asylum application with the — Mr. Ocampo's signature in the application for adjustment of status reveals that is, in fact, Mr. Ocampo's signature. And Mr. Ocampo signed — again, signed the asylum application, and the asylum application contained the very address to which the then INS sent these notices that we're talking about. If Mr. Ocampo didn't want an asylum application filed by Jerry, you know, why did he sign it, first of all? Why did he include his — that address if that wasn't his address? If he filled it out — if Mr. Ocampo filled the application out himself, he provided the address which — to which the notices were sent. So, clearly, none of this evidence, which is quote-unquote evidence, which is referred to by Mr. Ocampo's counsel on appeal, does not establish that there was any fraud whatsoever. There was no misleading whatsoever. His contentions are belied by the evidence he supplied in support of the allegations. And, you know, even if there was evidence of misleading, there's no evidence that he was diligent. This Court requires an alien to be diligent if they want to make out a case for tolling. It's seven years. Petitioner's counsel attempts to have the Court believe that, you know, it takes years and years and years at that time to get asylum hearings. But it didn't take years and years to get asylum hearings. Generally, what happened was relatively quickly after the asylum application is filed, a master calendar hearing is — scheduling hearing is convened at which the schedule is made out. And so, relatively quickly, the applicant gets in front of an asylum — gets in front of an immigration judge for scheduling. And my guess is that the hearing that Mr. Ocampo missed was such a scheduling conference. You know, seven years, he doesn't know — he doesn't think to contact the INS if an asylum application is — has been filed and he's waiting for a hearing. Also, the fact that there are notations on the visa application and the adjustment application that he's waiting for a 589 application doesn't really hold water in — when you consider his allegations, his new allegations, that he didn't want an asylum application to be filed. He didn't want an asylum application to be filed. Why put it on the application for adjustment of status? And, you know, why are we here? Mr. Bernstein, I think you're making us — or trying to make us feel better. What's the bottom line? Yes. The bottom line is the only issue the Court considers was the agency abused its discretion. And you think it didn't because? Yes. I was about to get to that, Your Honor. Yeah. It was an appropriate exercise of discretion. The statute and regulations, as Your Honor pointed out, provide that a 180-day deadline will be applied unless notice of the hearing is not provided either by personal service or by certified mail to the address provided by the alien. There's no question that an address was provided by the alien. There's no question that certified mail — certified letter was sent to the alien at that address. So the 180-day period applies because the service complied with the statute. There is no tolling because, as Your Honor observed, the only evidence presented to the immigration judge and the BIA, which reviewed the immigration judge's decision, was the blanket assertion, the bare assertion, I didn't get it. The dog eat my homework. That's simply, as the immigration judge properly found, not good enough. You must come up with some explanation. You were defrauded by a notario. You gave your attorney $2,000 to file something, and he didn't. Or he didn't — he created — excuse me — a situation whereby you weren't provided with notice. Nothing was provided, as the immigration judge and the board noted. I wanted to also point out that in response to a statement by my opponent, there is no, to my reading of the record, indication that the judge said he had problems with the signatures. He did note in a footnote that one of the signatures appeared to be Mr. Ocampo's, and one of the signatures appeared to be someone else's. Well, that's not a problem, because if you've got a signature, the post office will deliver the certified mail to a responsible adult at that address. So if you've got a signature, you've got compliance. The judge indicated that he thought Mr. Ocampo's signature was on the second, but that was not a component of his decision. He said, well, there are signatures. So they were delivered. They were delivered to that address. The service complied with its obligation. The 180-day rule kicks in, and there's absolutely no evidence. Mr. Ocampo provides absolutely no evidence in support of his bare assertion that the dog ate his homework that he didn't receive. And for the same reason, you've got to affirm the board and immigration judges' denial of the adjustment of status, application for adjustment of status later on filed seven years beyond the period within which an adjustment of status application can be filed. Again, there's no evidence that would tell you can't consider the new stuff, and we would ask the court to affirm the decisions of the board and immigration judge. All right. Thank you, Mr. Bernstein. The matter just argued will be submitted, and the court will now hear argument in Casilio Gutierrez v. Ashcroft.
judges: Canby, Rymer, Hawkins